IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND
(GREENBELT DIVISION)

| | | |
|---|---|---|
| NATURALAWN OF AMERICA, INC.<br>1 East Church Street<br>Frederick, Maryland 21701 | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. _____ |
| | ) | |
| WEST GROUP, LLC<br>5 West Chimney Rock Road<br>Bound Brook, NJ 08805 | ) | |
| | ) | |
| Serve: Stephen Fiala, Registered Agent<br>8W Chimney Rock Road, Unit H<br>Bound Brook, NJ 08805 | ) | |
| and | ) | |
| WEST GROUP II, LLC<br>5 West Chimney Rock Road<br>Bound Brook, NJ 08805 | ) | |
| | ) | |
| Serve: Stephen Fiala, Registered Agent<br>8W Chimney Rock Road, Unit H<br>Bound Brook, NJ 08805 | ) | |
| and | ) | |
| STEPHEN T. FIALA<br>216 Riverwoods Drive<br>New Hope, PA 18938 | ) | |
| and | ) | |
| WENDY FIALA<br>216 Riverwoods Drive<br>New Hope, PA 18938 | ) | |
| and | ) | |
| LEO WIENER<br>916 Bermuda Drive<br>Neshanic Station, NJ 08852 | ) | |

and                                          )
                                             )
JAMES SWANTON                                )
214 Sleepyhollow Road                        )
Red Bank, NJ  07701                          )
                                             )
and                                          )
                                             )
GREGORY CURTAIN                              )
261 Matey Avenue                             )
Manahawkin, NJ  08050                        )
                                             )
                          Defendants.        )

## COMPLAINT

Plaintiff, NaturaLawn of America, Inc. ("NLA" or "Plaintiff"), by counsel, as and for its

Complaint against Defendants, West Group, LLC ("West Group"), West Group II, LLC ("West

Group II"), Stephen T. Fiala ("Mr. Fiala"), Wendy Fiala ("Mrs. Fiala"), Leo Wiener ("Mr.

Wiener"), James Swanton ("Mr. Swanton"), and Gregory Curtain ("Mr. Curtain") (collectively

"Defendants"), hereby states as follows:

## PARTIES, JURISDICTION AND VENUE

1.      NLA is a Maryland corporation with its principal place of business in Frederick

County, Maryland.  NLA is a national franchisor of a comprehensive system for the sale of

organic-based lawn care services and authorized products, featuring applications of organic-

based fertilizers and biological weed and insect controls, diagnosis of lawn and landscape

problems, and an integrated pest management system (the "NLA System").

2.      West Group is a New Jersey limited liability company, with its principal office

located at 5 West Chimney Rock Road, Bound Brook, NJ 08805.

3.      West Group II is a New Jersey limited liability company, with its principal office

located at 5 West Chimney Rock Road, Bound Brook, NJ 08805.

2

4.      Mr. Fiala is an individual, who is a citizen of the State of Pennsylvania, and who resides at 216 Riverwoods Drive, New Hope, PA 18938.

5.      Mrs. Fiala is an individual, who is a citizen of the State of Pennsylvania, and who resides at 216 Riverwoods Drive, New Hope, PA 18938.

6.      Mr. Weiner is an individual, who is a citizen of the State of New Jersey, and who resides at 916 Bermuda Drive, Neshanic Station, NJ 08853.

7.      Mr. Swanton is an individual, who is a citizen of the State of New Jersey, and who resides at 214 Sleepyhollow Road, Red Bank, NJ 07701.

8.      Mr. Curtain is an individual, who is a citizen of the State of New Jersey, and who resides at 261 Matey Avenue, Manahawkin, NJ 08050.

9.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 inasmuch as the Plaintiff and all the Defendants are citizens of different states and the amount in controversy in this matter, exclusive of interest and costs, exceeds the sum of $75,000. This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 & 1338, 15 U.S.C. § 1121 and, with respect to certain claims, 28 U.S.C. § 1367.

10.     This Court has personal jurisdiction pursuant to Section 30.B of the Franchise Agreements defined below, because Defendants irrevocably consented "to submit themselves to the jurisdiction of the federal district courts located in the judicial district in which NLA's principal office is located."

11.     Venue is proper in this District pursuant to Section 30.B of the Franchise Agreements defined below, because that provision contains an express waiver of any objection to venue in this District.

## ALLEGATIONS COMMON TO ALL COUNTS

12.     NLA began using the mark NATURALAWN OF AMERICA in connection with fertilizers and biological and organic preparations for killing weeds, and in connection with biological and organic pesticides, on July 1, 1988.

13.     NLA began using the mark NATURALAWN OF AMERICA in connection with lawn care services on June 2, 1988.

14.     On January 22, 2000, NLA filed an application to register the Mark NATURALAWN OF AMERICA and design (the "Mark") with the United States Patent and Trademark Office ("PTO").

15.     The PTO issued a registration certificate on June 4, 2002 for the Mark for use in connection with fertilizers, biological and organic preparations for killing weeds, biological and organic pesticides, and "lawn care services." A true and correct copy of NLA's Certificate of Registration, Reg. No. 2,575,105, is attached as Exhibit 1.

16.     NLA is the sole and exclusive owner of the Mark.

17.     Since adopting the Mark in 1988, NLA has advertised its fertilizers, biological and organic weed killing preparations, pesticides, and lawn care services in print media to the consuming public, and in brochures and other direct mail marketing materials in an effort to add customers and franchisees.

18.     On or about October 30, 2001, NLA, on one hand, and Mr. Fiala, Mrs. Fiala, and West Group, on the other hand, entered into a Franchise Agreement, pursuant to which Mr. Fiala, Mrs. Fiala, and West Group were granted an exclusive right and license to operate an NLA franchised business using the NLA System in a territory consisting of Somerset County, New Jersey (the "Somerset Franchise Agreement"). A true and correct copy of the Somerset

4

Franchise Agreement is attached hereto as Exhibit 2.  Mr. Fiala, Mrs. Fiala, and West Group have been franchisees of NLA in the Somerset County territory since 1996.

19.     Pursuant to Section 2(D) of the Somerset Franchise Agreement, the initial term of the Somerset Franchise Agreement was for a period of five years from October 30, 2001.  See Exhibit 2 at p. 5.  In Attachment A to the Somerset Franchise Agreement titled "Statement of Ownership Interests & Franchisee's Principals", Mr. Fiala and Mrs. Fiala are identified as Controlling Principals of West Group and guaranteed the obligations set forth in the Somerset Franchise Agreement by signing Attachment A.  See Exhibit 2 at p. 37-8.  Mr. Fiala signed the Somerset Franchise Agreement individually and on behalf of West Group.

20.     On or about October 30, 2001, NLA, on one hand, and Mr. Fiala and West Group, on the other hand, entered into a Franchise Agreement, pursuant to which Mr. Fiala and West Group were granted an exclusive right and license to operate an NLA franchised business using the NLA System in a territory consisting of Mercer County, New Jersey (the "Mercer Franchise Agreement").  A true and correct copy of the Mercer Franchise Agreement is attached hereto as Exhibit 3.

21.     Pursuant to Section 2(D) of the Mercer Franchise Agreement, the initial term of the Mercer Franchise Agreement was for a period of five years from October 30, 2001.  See Exhibit 3 at p. 5.  In Attachment A to the Mercer Franchise Agreement titled "Statement of Ownership Interests & Franchisee's Principals", Mr. Fiala and Mrs. Fiala are identified as Controlling Principals of West Group and guaranteed the obligations set forth in the Somerset Franchise Agreement by signing Attachment A.  See Exhibit 3 at p. 37-8.  Mr. Fiala signed the Mercer Franchise Agreement individually and on behalf of West Group.

22.    Also on or about October 30, 2001, NLA, on one hand, and Mr. Fiala, Leo Wiener, and West Group II, on the other hand, entered into a Franchise Agreement, pursuant to which Mr. Fiala, Mr. Wiener, and West Group II were granted an exclusive right and license to operate an NLA franchised business using the NLA System in a territory consisting of Essex County, New Jersey (the "Essex Franchise Agreement"). A true and correct copy of the Essex Franchise Agreement is attached hereto as Exhibit 4.

23.    Pursuant to Section 2(D) of the Essex Franchise Agreement, the initial term of the Essex Franchise Agreement was for a period of five years from October 30, 2001. See Exhibit 4 at p. 5. In Attachment A to the Essex Franchise Agreement titled "Statement of Ownership Interests & Franchisee's Principals", Mr. Fiala, Mrs. Fiala, and Mr. Wiener are identified as Controlling Principals of West Group II and guaranteed the obligations set forth in the Essex Franchise Agreement by signing Attachment A. See Exhibit 4 at p. 37-8. Mr. Fiala and Mr. Wiener signed the Essex Franchise Agreement individually and on behalf of West Group II.

24.    Until about November 13, 2006, NLA believed that it was in negotiations with Defendants concerning renewal of the Somerset, Mercer, and Essex Franchise Agreements (collectively "Franchise Agreements"). On or about that date, however, NLA received a letter dated November 10, 2006 from counsel for Defendants to NLA's President, Philip Catron, stating that Defendants did not intend to renew the Franchise Agreements and considered them to be expired. See copy of November 10th letter attached as Exhibit 5.

25.    Section 11 of the Franchise Agreements provide the following non-compete provision:

> "Franchisee and each of the Controlling Principals, for a period of twenty-four (24) months after termination of this Agreement for any reason (*or the date such person ceases to be a Controlling Principal*), whether directly or indirectly, shall not engage in or acquire any financial or beneficial interest, including, without

6

limitation, any interest in corporations, partnerships, trusts, incorporated associations or joint ventures, in, assist or become a landlord of any lawn care or landscaping business, which is similar to the Business operated by Franchisee or Controlling Principal (as applicable), within the Licensed Territory or within the licensed territory of any NaturaLawn of America franchisee or within a twenty (20) miles radius of the perimeter of the Licensed Territory or any licensed territory of any NaturaLawn of America Business, whether such NaturaLawn of America Business is operated by another franchisee of [NLA] or by [NLA], or a subsidiary or affiliate of [NLA]."

See Exhibits 2, 3, and 4 at p. 12 (emphasis added).

26.    Attachment D to the Franchise Agreements provides the following non-compete

provision:

"...Covenantor agrees and covenants that for a period of twenty-four (24) months following the earlier of the expiration, termination or transfer of all of Franchisee's interest in the Franchisee Agreement or the termination of their employment by or associations with Franchisee, Covenanter will not without the prior written consent of [NLA]...directly or indirectly, for themselves or through, on behalf of or in conjunction with any person, engage in or acquire any financial or beneficial interest, including, without limitation, any interest in corporations, partnerships, trusts, incorporated associations or joint ventures, in assist or become a landlord of any lawn care of landscaping business, which is similar to the Business operated by Franchisee or Controlling Principal (as applicable), within the Licensed Territory or within the licensed territory of any other NaturaLawn of America franchisee or within a twenty (20) mile radius of the perimeter of the Licensed Territory or any licensed territory of any NaturaLawn of America Business, whether such NaturaLawn of America Business is operated by another franchisee of [NLA] or by [NLA], or a subsidiary or affiliate of [NLA]."

See Exhibits 2, 3, and 4 at p. 45-6.  "Covenantor" is defined in Attachment D as "certain

employees[,] agents, independent contractors, officers, directors and interest holders of

Franchisee, or any entity having an interest in Franchisee."  See Exhibits 2, 3, and 4 at p. 44.

Attachment D to the Somerset Franchise Agreement was signed by Mr. Fiala individually and

on behalf of West Group.    Attachment D to the Mercer Franchise Agreement was signed by Mr.

Fiala individually and on behalf of West Group.  Attachment D to the Essex Franchise

Agreement was signed by Mr. Fiala and Mr. Wiener individually and on behalf of West Group II.

27.     Section 11.C of the Franchise Agreements provides that Defendants "shall not appropriate, use or duplicate the [NLA] System, or any portion thereof, for use at any other lawn care, landscaping or other business." See Exhibits 2, 3, and 4 at p. 12. NLA's customer information and records are contained in the NLA database from Real Green Software. The Real Green Software itself is part of the NLA System.

28.     Attachment B to the Franchise Agreements, titled "Licensed Territory", defines the licensed territory in the Franchise Agreements as all zip codes within Somerset, Mercer, and Essex Counties, respectively. See Exhibits 2, 3, and 4 at p. 39.

29.     The Confidentiality Agreement provision of Attachment D to the Franchise Agreements prohibits the use and/or disclosure of any confidential information or trade secrets other than in the course of operating the NLA System franchises, including without limitation, NLA's practices, products, techniques, processes, customer lists, and know-how. See Exhibits 2, 3, and 4 at p. 43-45.

30.     Sections 11.E and 20.B of the Franchise Agreement provide that Defendants have no right to use the NLA System or any trade name, service mark, copyright, trademark or other intellectual property similar to or likely to be confused with those of NLA. See Exhibits 2, 3, and 4 at p. 12 and p. 27-28. In Section 20.B of the Franchise Agreements, Defendants also agree, upon termination or expiration of the Franchise Agreements, to "turn over to [NLA] all customer lists", and Defendants acknowledge that all "customers are the property of [NLA]". See Exhibits 2, 3, and 4 at p. 28.

31.     Section 16 of the Franchise Agreements provides that in the event of termination or expiration of the Franchise Agreements, NLA shall have the option to purchase the Business (defined in Section 2 as one or more offices used to operate the franchises) upon certain terms and conditions set forth therein. See Exhibits 2, 3, and 4 at p. 3 and p. 22. If NLA exercises the option, Section 20.A.5 of the Franchise Agreements requires that Defendants assist NLA "in every way possible to bring about a complete and effective transfer" of the Business. See Exhibits 2, 3, and 4 at p. 27.

32.     In Section 20.A.1 of the Franchise Agreements, upon termination or expiration of the Franchise Agreements, Defendants agree to "turn over to [NLA] the original and all copies of any records (both computer generated and manual) of the names and addresses and telephone numbers of all customers and clients up to and including the date of termination or expiration, together with all files pertinent to such customers and clients in the Licensed Territory; further [Defendants' agree] to retain no such information." See Exhibits 2, 3, and 4 at p. 27.

33.     In Section 20.A.3 of the Franchise Agreements, Defendants are obligated to pay all service fees owing to NLA immediately upon termination or expiration. See Exhibits 2, 3, and 4 at p. 27.

34.     Upon information and belief, Defendants are currently operating a lawn care and/or landscape business, under the name "Jersey Green", identical or substantially similar to the NLA System, in direct competition with NLA. Upon information and belief, Defendants are operating the Jersey Green business within the counties of Somerset, Mercer, and Essex. Such operations are within the Licensed Territories and/or within a 20-mile radius thereof.

35.     Upon information and belief, Mr. Swanton is the Manager of Jersey Green and Mr. Curtain is the Sales Manager of Jersey Green.

36.     Upon information and belief, Defendants are currently using NLA's confidential information and trade secrets, including without limitation, NLA's practices, products, techniques, processes, customer lists, and know-how, in violation of the Franchise Agreements.

37.     Upon information and belief, Defendants have diverted customers and clients of the NLA System to become customers of Defendants' Jersey Green business. Specifically, Defendants have sent advertising materials to the NLA System's customers and clients announcing a name change from NLA to Jersey Green. Upon information and belief, Defendants continued to service the NLA System's customers and clients.

38.     Defendants are continuing to use the NLA System, including without limitation, the NLA database from Real Green Software.

39.     Defendants are continuing to use the Mark in operating Jersey Green. Defendants are not licensed by NLA to use the Mark and have no right to use the Mark or any confusingly similar mark. To date, upon information and belief, many consumers of lawn care services and many potential customers have been and are actually confused by Defendants' use of the Mark, believing that Defendants' services are actually provided by the NLA System.

40.     The Confidentiality Agreement & Covenant Not to Compete Agreement states that "[t]he parties acknowledge and agree that each of the covenants contained herein are reasonable limitations as to time, geographical area, and scope of activity to be restrained and do not impose a greater restraint than is necessary to protect the goodwill or other business interests of Franchisor..." See Exhibits 2, 3, and 4 at p. 46-7.

41.     The Confidentiality Agreement & Covenant Not to Compete Agreement also states that:

> Covenantor agrees that in the event of a breach of this Agreement, [NLA] would be irreparably injured and be without an adequate remedy at law. Therefore, in

> the event of such a breach, or threatened or attempted breach of any of the provisions hereof, [NLA] shall be entitled to enforce the provisions of this Agreement and shall be entitled, in addition to any other remedies which are made available to it at law or in equity, including the right to terminate the Franchise Agreement, to temporary and/or permanent injunction and a decree for the specific performance of the terms of this Agreement, without the necessity of showing actual or threatened harm and without being required to furnish a bond or other security.

See Exhibits 2, 3, and 4 at p. 46.

42.     In the November 10th letter from counsel for Defendants, Defendants confirmed their intent to not abide by the non-compete provisions in the Franchise Agreements. See copy of November 10, 2006 letter attached as Exhibit 5.

43.     Defendants currently owe $5,656.76 in outstanding services fees to NLA pursuant to Section 20.A.3 of the Franchise Agreements.

44.     Defendants have failed to turn over any records as required by Section 20.A.1 of the Franchise Agreements.

45.     On November 15, 2006, NLA sent a letter to Defendants exercising its right to purchase Defendants' office(s) pursuant to Section 16 of the Franchise Agreements. See copy of November 15, 2006 letter attached as Exhibit 6. NLA requested an accounting of certain information in order to determine the purchase price under Section 16. See Exhibit 6. NLA further reminded Defendants of certain obligations under the Franchise Agreements, including without limitation, Defendants' obligation under Section 20.A.5 to fully cooperate to assist NLA to bring about a complete and effective transfer. See Exhibit 6. NLA requested that Defendants provide the requested information no later than 5:00 p.m. on November 17, 2006. See Exhibit 6. To date, Defendants have not provided the requested information or otherwise responded to the November 15th letter.

46.     Section 23 of the Franchise Agreements provides that NLA is entitled to reimbursement of its costs and attorney's fees incurred as a result of any breach of the Franchise Agreements.  See Exhibits 2, 3, and 4 at p. 28.

## COUNT I - VIOLATION OF THE LANHAM ACT

### (ALL DEFENDANTS)

47.     NLA restates and realleges paragraphs 1 through 46.

48.     Defendants' continued use of the Mark in any format in connection with its lawn care services infringes the Mark and has caused, is causing, and is likely to continue to cause confusion, mistake or to deceive consumers in violation of the Lanham Act, 15 U.S.C. § 1114(1)(a).

49.     Defendants' continued use of the Mark in any format in connection with its lawn care services constitutes unfair competition and has caused, is causing, and is likely to continue to cause confusion, mistake or to deceive consumers in violation of the Lanham Act, 15 U.S.C. § 1125(a).

50.     Defendants' continued use of the Mark has caused and is causing NLA great and irreparable injury and unless restrained, will cause further irreparable injury for which NLA has no adequate remedy at law.

WHEREFORE, NLA respectfully requests that this Court enter judgment against Defendants in an amount to be determined at trial, which amount should be trebled under 15 U.S.C. § 1117, plus costs and attorney's fees incurred in bringing this Complaint, grant a preliminary and permanent injunction prohibiting Defendants from further infringing upon the Mark, and grant such other and further relief that this Court deems proper.

## COUNT II - VIOLATION OF MARYLAND UNIFORM TRADE SECRETS ACT

### (ALL DEFENDANTS)

51.     NLA restates and realleges paragraphs 1 through 50.

52.     Defendants' above-described conduct in using NLA's trade secrets, including without limitation, NLA's practices, products, techniques, processes, customer lists, and know-how, is in violation of the Maryland Uniform Trade Secrets Act, Md. Code Ann., Com. Law § 11-1201 *et. seq.* (2006).

53.     The aforementioned trade secrets (a) derive independent economic value to NLA, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from their disclosure or use; and (b) are the subject of efforts by NLA that are reasonable under the circumstances to maintain their secrecy.

54.     Defendants have in the past and are continuing to misappropriate NLA's trade secrets by disclosing and/or using such trade secrets, of which they owed a duty to NLA to maintain their secrecy.

55.     As a result of Defendants' conduct, NLA has suffered and will continue to suffer damages, including without limitation, diverted business and past and future revenue.

56.     Defendants' conduct constitutes willful misconduct, malice, fraud, wantonness, oppression and/or such gross indifference and recklessness as to amount to a wanton or willful disregard of the rights of NLA.  Therefore, NLA is entitled to exemplary damages of twice the amount of any monetary award.

57.     Absent injunctive relief, NLA will continue to suffer irreparable harm as a result of Defendants' continuing disclosure and/or use of NLA's trade secrets, for which there is no adequate remedy at law.

WHEREFORE, NLA respectfully requests that this Court enter judgment against Defendants in an amount to be determined at trial, which shall be doubled under Md. Code Ann., Com. Law § 11-1203, plus costs and attorney's fees incurred in bringing this Complaint, grant a preliminary and permanent injunction prohibiting Defendants from further violating the Maryland Uniform Trade Secrets Act, and grant such other and further relief that this Court deems proper.

## COUNT III - BREACH OF CONTRACT

### (DEFENDANTS WEST GROUP, WEST GROUP II, MR. FIALA, MRS. FIALA & MR. WIENER)

58.     NLA restates and realleges paragraphs 1 through 57.

59.     The Franchise Agreements are valid and enforceable contracts.

60.     Defendants' above-described conduct in operating Jersey Green, a business in direct competition with the NLA System, and using NLA's confidential information and trade secrets, are in direct violation of Sections 11 and 20 of the Franchise Agreements and Attachment D to the Franchise Agreements.

61.     Defendants' above-described conduct in using the Mark and advertising a name change from NLA to Jersey Green in an attempt to divert customers and clients is in direct violation of Sections 11 and 20 of the Franchise Agreements.

62.     Defendants' failure to turn over to NLA all customer lists and other records and to acknowledge that all customers are the property of NLA is in direct violation of Section 20 of the Franchise Agreements.

63.     Defendants' continued use of the NLA database from Real Green Software is a direct violation of Section 11 of the Franchise Agreements.

64.     Defendants' above-described conduct in failing to respond to NLA's election to purchase the Business and failing to assist to bring about a complete and effective transfer by not providing the requested information is in direct violation of Sections 16 and 20 of the Franchise Agreements.

65.     Defendants' failure to pay $5,656.76 in outstanding services fees to NLA is in direct violation of Section 20 of the Franchise Agreements.

66.     As a result of Defendants' breaches of contract, NLA has suffered and will continue to suffer damages, including without limitation, diverted business and past and future revenue.

67.     The revenue realized by Defendants from their breaches of the Franchise Agreements is unknown to NLA. NLA therefore demands that Defendants provide an accounting of their sales and revenue realized from the sale of products and services, for purposes of ascertaining damages.

68.     Absent injunctive relief, NLA will continue to suffer irreparable harm as a result of Defendants' continuing breaches of the Franchise Agreements, for which there is no adequate remedy at law.

WHEREFORE, NLA respectfully requests that this Court enter judgment against Defendants in an amount to be determined at trial and after a full accounting of Defendants' sales and revenue realized from the sale of products and services diverted from NLA, plus costs and attorney's fees incurred in bringing this Complaint, grant a preliminary and permanent injunction

prohibiting Defendants from further violating the Franchise Agreements, and grant such other and further relief that this Court deems proper.

## COUNT IV - SPECIFIC PERFORMANCE

### (DEFENDANTS WEST GROUP, WEST GROUP II, MR. FIALA, MRS. FIALA & MR. WIENER)

69.    NLA restates and realleges paragraphs 1 through 68.

70.    The Franchise Agreements are valid and enforceable contracts.

71.    The Franchise Agreements are clear, certain and definite in all material terms.

72.    NLA has performed its obligations under the Franchise Agreements and is ready, able and willing to perform its obligations under Section 16 of the Franchise Agreements.

73.    Defendants' above-described conduct in failing to respond to NLA's election to purchase the Business and failing to assist to bring about a complete and effective transfer by not providing the requested information is in direct violation of Sections 16 and 20 of the Franchise Agreements.

74.    NLA demands that Defendants provide the requested information so that NLA can determine the purchase price of the Business under Section 16 of the Franchise Agreements.

WHEREFORE, NLA respectfully requests that this Court grant its request for specific performance of Section 16 of the Franchise Agreements and order Defendants to respond to NLA's election to purchase the Business and to assist to bring about a complete and effective transfer by providing the requested information, and grant such other and further relief that this Court deems proper.

## COUNT V - TORTIOUS INTERFERENCE WITH
## PROSPECTIVE BUSINESS RELATIONS

### (DEFENDANTS WEST GROUP, WEST GROUP II, MR. FIALA, MRS. FIALA & MR. WIENER)

75.     NLA restates and realleges paragraphs 1 through 74.

76.     Defendants have knowledge of NLA's prospective business relations with the NLA System's customers and clients.

77.     Defendants have intentionally interfered with NLA's prospective business relations by competing with the NLA System to provide lawn care and landscape products and services, and by using NLA's confidential information and trade secrets, and the Mark, to do so.

78.     Defendants' conduct is calculated to cause damage to NLA and is being done with the unlawful purpose to cause such damage, without right or justifiable cause on the part of Defendants.

79.     Defendants' conduct constitutes improper methods.

80.     Absent such conduct, NLA would have realized its business expectancy.

81.     As a result of such conduct, NLA has suffered and will continue to suffer damages, including without limitation, diverted business and past and future revenue.

82.     Defendants' conduct constitutes willful misconduct, malice, fraud, wantonness, oppression and/or such gross indifference and recklessness as to amount to a wanton or willful disregard of the rights of NLA.  Therefore, NLA is entitled to an award of punitive damages.

83.     Absent injunctive relief, NLA will continue to suffer irreparable harm as a result of Defendants' continuing tortious interference with NLA's prospective business relations, for which there is no adequate remedy at law.

17

WHEREFORE, NLA respectfully requests that this Court enter judgment against Defendants in an amount to be determined at trial and after a full accounting of Defendants' sales and revenue realized from the sale of products and services diverted from NLA, grant a preliminary and permanent injunction prohibiting Defendants from further violating the Franchise Agreements, and grant such other and further relief that this Court deems proper.

## COUNT VI - TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS

### (DEFENDANTS SWANTON & CURTAIN)

84.     NLA restates and realleges paragraphs 1 through 83.

85.     Defendants have knowledge of NLA's prospective business relations with the NLA System's customers and clients.

86.     Defendants have intentionally interfered with NLA's prospective business relations by using NLA's confidential information and trade secrets, including without limitation, NLA's customer list and the NLA System by Real Green Software, and by using the Mark, to do so.

87.     Defendants' conduct is calculated to cause damage to NLA and is being done with the unlawful purpose to cause such damage, without right or justifiable cause on the part of Defendants.

88.     Defendants' conduct constitutes improper methods.

89.     Absent such conduct, NLA would have realized its business expectancy.

90.     As a result of such conduct, NLA has suffered and will continue to suffer damages, including without limitation, diverted business and past and future revenue.

91.   Defendants' conduct constitutes willful misconduct, malice, fraud, wantonness, oppression and/or such gross indifference and recklessness as to amount to a wanton or willful disregard of the rights of NLA.  Therefore, NLA is entitled to an award of punitive damages.

92.   Absent injunctive relief, NLA will continue to suffer irreparable harm as a result of Defendants' continuing breaches of the Franchise Agreement, for which there is no adequate remedy at law.

WHEREFORE, NLA respectfully requests that this Court enter judgment against Defendants in an amount to be determined at trial and after a full accounting of Defendants' sales and revenue realized from the sale of products and services diverted from NLA, grant a preliminary and permanent injunction prohibiting Defendants from further violating tortiously interfering with NLA's prospective business relations, and grant such other and further relief that this Court deems proper.

Respectfully Submitted,

Karen A. Doner (Bar No. 15065)
WILLIAMS MULLEN
A Professional Corporation
8270 Greensboro Drive, Suite 700
McLean, VA  22102
(703) 760-5238
(703) 748-0244 (fax)
Counsel for NaturaLawn of America, Inc.

1359598v3

19